Filed 3/10/25  In re Aaron L. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re AARON L., a Person Coming Under the Juvenile Court Law. | B336317 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.R.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 23CCJP03974 |

APPEAL from orders of the Superior Court of Los Angeles County, Kristen Byrdsong, Juvenile Court Referee.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Melania Vartanian, Deputy County Counsel for Plaintiff and Respondent.

———————————

Mother challenges the juvenile court's jurisdictional findings and order declaring her then-10-year-old son Aaron a dependent of the court under Welfare and Institutions Code section 300, subdivisions (a) and (b)(1).[1]  Mother contends there was no substantial evidence that Aaron was at substantial risk of serious harm due to mother's or father's alleged conduct. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

The Department received a call in mid-October 2023 alleging mother had left Aaron (born May 2013) at maternal grandmother's house and was living on the streets, doing drugs. Before mother left, maternal grandmother (MGM) had called the police "to get mother out of her home."  On October 26, 2023, a Department social worker called mother and told her the Department was investigating allegations of general neglect. Mother refused to speak with the social worker.

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     Mother challenges the jurisdictional findings based on both her and father's conduct.  Father has not appealed.  As we conclude below, substantial evidence supports the court's jurisdictional findings based on mother's conduct.  Accordingly, we do not discuss in detail father's separate conduct or his domestic violence against mother.  (See *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*) [where substantial evidence supports at least one statutory ground for jurisdiction, appellate court need not consider validity of other alleged grounds for jurisdiction].)

That same day, the social worker interviewed Aaron at his school. He confirmed mother had dropped him off about three weeks earlier. He had not seen her, but he had spoken to her on his cell phone the day before. Aaron said his mother had dropped him off before, but this was the longest time she had left him. They had been homeless, staying at hotels or on others' couches. When they didn't have a place to stay, Aaron said his mother would drop him off at his aunt's or grandmother's home. He stated his mother took good care of him when they were together and he always had enough to eat. As for his father, Aaron told the social worker he did not like him and had not seen him in "a long time." Aaron stated father had mental health issues—he had gotten angry and hit his mother in the past. He had seen father "shove" and "punch" mother. Aaron denied fearing mother or father and said mother always had been "available to meet his needs." Aaron felt safe in his aunt's home.

The social worker also spoke to maternal aunt by phone. Maternal aunt said she had told mother she would watch Aaron until mother was better. Maternal aunt told the social worker mother was mentally unstable and addicted to drugs. Mother's drug addiction had gotten worse over the last two years. Maternal aunt explained mother initially had not made a plan with her to care for Aaron—she "just left" Aaron at the home of MGM, who had said she could not care for the child. Another of mother's sisters could not care for Aaron either, so maternal aunt told mother she would watch him. Aaron currently was sleeping on her couch, but she was in the process of moving to a bigger home and would have more space for Aaron.

The next day, October 27, 2023, the social worker interviewed MGM at her home. MGM had mother "removed

3

from her home a couple of weeks ago because she was 'acting crazy.' " Mother told her she would return for Aaron, but mother never did. MGM told the social worker mother was a drug addict and had mental health issues. She did not know what kind of drugs mother used or her mental health diagnosis. MGM was not willing to care for Aaron due to her age. She said maternal aunt, a nurse, had agreed to care for Aaron, and MGM was willing to supervise him after school.

On November 1, 2023, the social worker assessed maternal aunt's home and found it was appropriate. Maternal aunt told the social worker mother had messaged her that day and asked if Aaron could stay with her a little longer. Mother did not say when she planned to pick Aaron up. Maternal aunt was willing to care for Aaron "as long as needed"—she wanted him "to be safe and not out in the streets." Maternal aunt told the social worker MGM had kicked mother out of her home because mother "was being aggressive." According to maternal aunt, MGM had raised mother's two adult sons.

The social worker reached mother by phone on November 8, 2023. Mother denied the allegations. She said MGM "had kicked her out of her home with all her belongings in bags." She was embarrassed to walk around the streets with her bags and child and also did not want to expose Aaron to the streets. Mother told MGM she would return to pick up Aaron. Mother said she had not returned for Aaron because she still was on the streets, which were dangerous and no place for a child. When the social worker asked mother what her plan was for Aaron, she responded, " 'Does it matter if I make a plan[?]' " Mother said maternal aunt had offered to "keep Aaron until she was ready." Mother wasn't sure when that would be—she wanted to find

4

"a place for them" first; she did not want Aaron on the streets. Mother denied having any issues with or using drugs. She was not willing to drug test for the Department without a court order, however. Mother told the social worker she was spending her money on hotels—not drugs—because she was homeless. (MGM had said mother received $800 a month and had no money by the third day because she was out doing drugs.) Mother said she had been staying with different people and was in the process of moving. She did not want to tell the social worker where she was living. When the social worker asked mother about giving maternal aunt temporary custody, mother refused.

Mother identified Aaron's father but did not have his contact information. Mother hadn't had any contact with him "for a long time." Parents had a "past referral history of domestic violence" with the Department corroborated by law enforcement incident reports. In May 2022, Aaron saw father slap mother on the head with an open hand. In March 2022, a caller reported father put mother in a chokehold in front of Aaron; the incident report stated father punched mother.

The court authorized Aaron's removal from mother and father on November 16, 2023. On November 20, 2023, the Department filed a section 300 petition alleging Aaron was at risk of harm due to father's violent conduct against mother, and mother's failure to make an appropriate plan for his safety and wellbeing when she left him with MGM. At the initial hearing on November 21, 2023, the juvenile court detained Aaron from mother and father, who were not present, and ordered they have monitored visits. The court also ordered drug testing referrals for parents. On December 29, 2023, the Department filed a first amended section 300 petition adding allegations

that mother had a history of mental and emotional problems, and father had a history of violent and assaultive behaviors, that endangered Aaron's physical health and safety and placed him at risk of serious physical harm and danger.

The Department filed its jurisdiction/disposition report on January 3, 2024. On December 5, 2023, the dependency investigator (DI) interviewed Aaron at maternal aunt's home, where he remained placed. Aaron had not seen his mother since she left but had spoken to her by cell phone. He hadn't seen or spoken to his father. He did not have father's phone number or know where he was. Aaron said he missed his parents but "mother need[ed] to find stable housing and get herself together." He also wanted to see and live with father. Aaron nevertheless stated, " 'I love being here,' " referring to maternal aunt's home.

When asked, Aaron told the DI this was the first time mother had left him with family for an extended period. They had been living with MGM for about a year when she "kicked [mother] out" after she and mother got into an argument about an issue with a bathroom fixture. Aaron stated, " 'She (mother) left and I . . . went to school.' " Aaron didn't know why mother didn't pick him up from MGM's home after school that day. Nor did mother call Aaron to explain he would be staying with maternal aunt. Aaron said, " 'My grandma wanted me to stay because my grandma didn't know where my mom was going to go.' " Aaron did not know where mother was living.

The DI asked Aaron about domestic violence. He saw father punch mother in the face once about a year or two earlier. Mother pushed father away and called the police. The DI asked Aaron if he remembered an incident where father placed mother

in a chokehold.  Aaron replied, " 'Oh yeah they were arguing and my dad put my mom in a chokehold and I was trying to stop it and then he stopped.'  'We were in the car.'  'I think to buy something to eat.'  'They were arguing.' "  When asked if his parents argued frequently, Aaron responded, " 'Yeah but they don't hit a lot.' "  He didn't know what they argued about and didn't think they were in a current relationship.  Aaron also denied having seen mother or father use drugs.  Aaron denied ever seeing mother display signs of mental illness.

The DI also spoke with maternal aunt.  She told the DI mother communicated with her " 'here and there and she asks how he's [Aaron] doing.' "  Mother was thankful Aaron was with maternal aunt.  Mother had called the day before, but she did not speak with Aaron, who was at school.  Maternal aunt was concerned about mother's mental health.  She described mother as " 'not all there' " since their father (maternal grandfather) died.  On the day MGM kicked mother out of her home, law enforcement had arrived and asked maternal aunt if she could care for Aaron.  She agreed and picked Aaron up after school that same day.  Mother asked her if Aaron could stay with her for a few days, and maternal aunt agreed.  Mother called maternal aunt again a few days later and asked if Aaron could stay with her a little longer.  Maternal aunt said she agreed and told mother Aaron " 'could stay with me because [I] didn't want him in the street.' "  Maternal aunt told the DI this was the first time Aaron had been in her care for this length of time.  He sometimes visited for a weekend to play with her daughters, but never had stayed this long.  Maternal aunt similarly explained that mother would drop off Aaron with MGM for a day visit but no longer.

When asked about substance use concerns, maternal aunt said she believed father had introduced mother to drugs. She had no evidence of mother's drug use—and mother had denied using any substances—but believed mother looked different. Maternal aunt did not have concerns for Aaron in mother's care in terms of neglect or physical abuse. Rather, her main concern was mother's lack of stable housing.

The DI spoke with paternal uncle about father. The paternal family had an active criminal protective order protecting them from father. Father would become violent with the family while under the influence of drugs. Aaron had stayed with paternal family for a few days at the beginning of the year.

On December 13, 2023, the DI spoke with MGM. MGM had not seen mother since she left the home. She was worried mother was alone on the streets. MGM believed mother was using drugs based on her appearance. MGM confirmed this was the longest period of time mother ever had left Aaron in the family's care. Mother and Aaron had been living with her for about a month and a half. Before that, mother used hotel vouchers, and mother and Aaron had lived with maternal uncle. MGM also had mental health concerns about mother. MGM said she never witnessed any domestic violence incident between parents, but mother had told her about them. She often observed marks and bruises on mother's arms, face, legs, and thighs, however. MGM stated she last saw mother with bruises about a month earlier.

On December 15, 2023, mother called the DI, who interviewed her about the petition's allegations. Mother insisted she had made a plan with maternal aunt for Aaron's care before the Department became involved. She did not believe Aaron

had been detained from her.  The DI told mother the court had ordered the Department to give mother a testing referral. Mother denied using drugs.  She said she had consumed alcohol in the past but had stopped after her father had died four years earlier.  Mother also admitted smoking marijuana eight years earlier.  She thought her family believed she was on drugs because of her unstable housing and her skin problems.  When the DI asked mother if she would drug test, mother replied, " 'No why am I gonna go today?'  'I have no clothes to shower.' 'I haven't eaten all day today . . . .'  'I have no money to wash.' 'I haven't eaten I feel we[a]k.'  'I don't want to go.'  'I'm not gonna go until [I] talk to the judge.' "

The DI also asked mother about her mental health.  Mother explained she received therapy and psychiatric assistance in 2022 for about six months.  She stopped attending therapy when her housing became unstable.  Mother stated she was diagnosed with major depression in 2019 and with a mood disorder in 2022. She took Lexapro for a year but stopped.  She stated, " 'I didn't feel like I needed it anymore.' "

As far as Aaron having been left in maternal aunt's care, mother explained MGM had called law enforcement when she told mother she had to leave.  Law enforcement would not let mother take Aaron with her and insisted on taking him to school. Mother said she told her sister, " 'I'm not sure if I can come back because I had nowhere to go.' "  Before Aaron's school let out, mother said she called her sister and asked her, " ' "[C]ould [he] please stay with you so that I can get a room?" ' "  Mother continued, " 'I was in the street alone, literally alone with no money and no support.' "  Mother confirmed this was the first time she had left Aaron with family for this length of time.

When asked about her current plan, mother responded, " 'I'm planning on getting my contacts back from my phone because it broke and get started on my housing and look for perm[anent] housing.' "

The DI explained to mother that the court had ordered her to have monitored visits with Aaron. Mother did not want any visits with Aaron with a monitor present. The DI tried to explain visits were important for the reunification process. Mother replied she did not want visits "as she [did] not need a monitor."

After interviews with mother and Aaron, the Multidisciplinary Assessment Team (MAT)/Child and Family Team (CFT) met on January 31 about their findings. Aaron wanted to stay in his aunt's care. He needed to know he would be "taken care of by his family." Aaron had reported he was "constantly worried about what will happen to him." The assessor was concerned mother would stop her mental health services. The MAT report noted mother would benefit from individual therapy sessions and continuing to participate in mental health services.

The Department filed a last minute information (LMI) on February 9 and on February 22, 2024. Mother had failed to show for drug testing the last four weeks. Mother had not visited Aaron nor made herself available for educational decisions. Mother also had canceled a February 21 meeting with the social worker. The Department noted Aaron needed an Individual Education Plan (IEP), but parents had not made themselves available to sign the documentation. The Department asked the court to appoint maternal aunt co-holder of Aaron's educational and developmental rights. The court did so on February 23.

During an interview with the DI at his place of incarceration, father admitted he recently had used " 'crystal meth' " and had used heroin in the past. Accordingly, on February 24, 2024, the Department filed a second amended petition, adding allegations regarding father's drug use. On February 29, the court continued the adjudication hearing to March. The court also ordered the Department to confirm whether the parenting class in which mother had enrolled was Department-approved and, if not, to refer mother to an approved class.

At the March 22 adjudication hearing, mother—through her counsel—"vehemently denie[d]" that she failed to make a plan for Aaron's care. She insisted she had made a plan for maternal aunt to care for him. Counsel argued it was only after MGM escalated the situation by calling the police that mother was unable to be there for Aaron, but she "immediately made plans for the child to be with maternal aunt." Counsel also argued the Department had not proved mother had any mental or emotional issues, which mother denied. Even if she had such issues, counsel argued they did not affect mother's parenting, as Aaron "was safely cared for, attending school and had food and clothing."

Minor's counsel submitted on the Department's recommendation. Counsel stated, "We believe mother does have mental health issues and did not create the appropriate plan and essentially dumped her child with family who did not expect to care for the child, long-term. Our hope is that mother will start cooperating with the Department and then be in a position to take her son back in, but we don't seem to be there, yet."

11

The court sustained the petition as alleged. The court declared Aaron to be a person described by section 300 and found, by clear and convincing evidence, that he could not remain safely in parents' care. The court found there were no reasonable means to prevent the child's removal "given the unresolved issues of domestic violence, substance abuse, and untreated mental health." The court ordered mother to complete random or on-demand testing, to participate in a domestic violence support group, parenting classes, and individual counseling, and to submit to an Evidence Code section 730 evaluation. Mother appealed.

## DISCUSSION

Mother challenges the juvenile court's sustaining of the amended petition's allegations under section 300 subdivisions (a) and (b). The subdivision (a) allegation was based on parents' history of engaging in domestic violence in Aaron's presence. The subdivision (b) allegations were based on the same domestic violence count and four others: mother having left Aaron in the care of MGM without making an appropriate plan for his care; mother's untreated mental health and emotional issues; father's history of violent behaviors; and father's history of substance abuse. Mother contends substantial evidence did not show Aaron was at a current or future risk of harm from domestic violence, mother's mental health issues, or father's violent behaviors and drug use, and substantial evidence did not support finding mother abandoned Aaron at MGM's home.[3]

---

[3] A child's exposure to domestic violence may serve as the basis of dependency jurisdiction. (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.) There must be a reason to believe the

12

## 1.	*Standard of review and applicable law*

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633; *I.J., supra*, 56 Cal.4th at p. 773.)  Inferences that are the result of speculation or conjecture, however, are insufficient to support a jurisdictional finding.  (*In re B.D.* (2024) 103 Cal.App.5th 315, 324.)  " 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 412 (*L.B.*).)  " '[A] reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.' " (*I.J.,* at p. 773.)

---

domestic violence will recur to demonstrate a child is at future risk of physical harm based on past exposure.  (*In re S.F.* (2023) 91 Cal.App.5th 696, 714.)  We need not reach the issue because we find sufficient evidence supports the other two grounds— based on mother's conduct—for jurisdiction under section 300, subdivision (b)(1):  her failure to make an appropriate plan for Aaron and her untreated mental health issues.  (*I.J., supra,* 56 Cal.4th at p. 773.)  As discussed, we similarly need not consider the jurisdictional grounds based on father's other violent behaviors or his drug use.  (See fn. 2, *ante*.)

13

A child comes within the jurisdiction of the juvenile court under subdivision (b)(1) of section 300 if, as relevant here, "there is a substantial risk that the child will suffer, serious physical harm or illness," as a result of: the failure or inability of the child's parent to adequately supervise or protect the child; the willful or negligent failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment; or the inability of the parent to provide regular care for the child due to the parent's mental illness or substance abuse. (§ 300, subd. (b)(1)(A), (C), (D).) A child cannot be found to be a person described by subdivision (b)(1), however, solely due to "[h]omelessness or the lack of an emergency shelter for the family." (§ 300, subd. (b)(2)(A).)

A jurisdictional finding under section 300, subdivision (b)(1) requires the Department to prove: "(1) the parent's . . . neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.) The statute permits jurisdiction under this subdivision "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (§ 300, subd. (b)(3).) Thus, "[t]he relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing ' "subject the minor to the defined risk of harm." ' " (*L.B., supra*, 88 Cal.App.5th at p. 411.) The juvenile court need not wait for the child actually to be abused or neglected before it can assume jurisdiction, however. (*I.J., supra*, 56 Cal.4th at p. 773.) "The court may consider past events in deciding whether a child presently needs the court's protection. [Citations.] A parent's ' "[p]ast

14

conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Cole L.,* at p. 602.) In other words, the Department "must establish a nexus between the parent's past conduct and the current risk of harm." (*In re J.N.* (2021) 62 Cal.App.5th 767, 775.)

## 2. *Substantial evidence supports the juvenile court's assertion of jurisdiction over Aaron*

Mother contends the evidence does not support the finding that she did not make a plan for Aaron's care. As mother argues, she left Aaron with MGM because she did not want him on the streets with her. She insisted she had made a plan for Aaron's care with maternal aunt before the Department became involved. As mother notes, in its February 9, 2024 LMI the Department acknowledged, "Both mother and [maternal aunt] disclosed that prior to [the Department's] involvement, mother made a verbal plan that Aaron would remain with [maternal aunt] given mother did not have a stable place to live and neither mother nor [maternal aunt] wanted Aaron on the street."

As detailed above, when mother was kicked out of MGM's home, authorities asked maternal aunt to keep Aaron and she agreed. Mother then asked aunt if she could keep Aaron and later asked if he could stay longer with her. Although mother and maternal aunt may have come to an informal agreement after mother left, substantial evidence —viewed in the light most favorable to the order—supports the court's finding that mother did not make an *appropriate plan* for Aaron's "safety and well being" when she left him with MGM.

Mother did not arrange for Aaron's long term care. After MGM kicked mother out, mother did not tell anyone —not even Aaron—when she would return. Critically, MGM had said she could not take care of Aaron. Nor could another aunt care for him, so maternal aunt agreed she would. Maternal aunt thus already had stepped in when mother asked her to keep Aaron. It was unexpected that mother would leave Aaron for such a long time. She never had done that before. And mother left Aaron without provisions. Maternal aunt had to buy clothes for him.

Mother argues Aaron was not at substantial risk of harm because maternal aunt was caring for him at all times and had agreed he could stay with her until mother was ready. True, Aaron was safe in maternal aunt's care at the time of the jurisdictional hearing. Nevertheless, mother never gave MGM or maternal aunt any written authorization to make decisions about Aaron's care. Mother did not make herself available for important educational decisions. Nor does anything in the record reflect she gave MGM or maternal aunt any type of authorization to make medical decisions for Aaron in the event of an emergency. Mother also refused to consider giving maternal aunt temporary custody while she got "herself together." Given neither MGM nor maternal aunt ever had cared for Aaron long term—and mother's whereabouts were unknown to them—the court reasonably could find maternal relatives had no authority to stand in for mother should Aaron require any type of medical attention or other parental permission.

Moreover, the record shows mother lacked insight into how leaving Aaron without a clear plan could affect him. When the social worker asked mother what her plan was for Aaron, she responded, " 'Does it matter if I make a plan[?]' " Indeed, during the MAT assessment, Aaron reported he was "constantly worried" about what would "happen to him." Nor could the Department confirm mother's participation in an online parenting course— or verify the course's curriculum—to assess if mother had taken steps to gain insight.[4] Mother also had acknowledged she had untreated mental health issues that the court could find impeded her ability to make an appropriate plan for Aaron. For example, she refused to visit Aaron because she didn't want the visits to be monitored. By the time of the jurisdictional hearing, mother still had not arranged to visit her son. Indeed, she had not seen him since leaving him at MGM's home. Accordingly, based on the totality of the circumstances, the juvenile court reasonably could find mother again would leave Aaron without making an appropriate plan. And mother's failure to give maternal relatives official authorization to make decisions on Aaron's behalf—or to tell them her whereabouts—put Aaron at a current risk of harm despite his aunt's care of him.

Similarly, there is ample evidence in the record that mother had unresolved mental health issues. Mother

---

[4]     The course apparently was provided by a company in Ireland, but the documentation listed no phone number or other contact information.

admitted she had been diagnosed with major depression and a mood disorder in 2019 and 2022, respectively, and had been prescribed psychotropic medication. Mother stopped taking her medication because she didn't feel she needed it, however, and discontinued therapy due to her unstable housing situation. Mother argues the Department failed to prove a nexus between her mental health issues and a current risk of harm to Aaron. "[H]arm may not be presumed from the mere fact of a parent's mental illness." (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1050.)

Here, however, substantial evidence supports the juvenile court's finding that Aaron faced a risk of harm. Based on the record, the juvenile court reasonably could find mother's untreated mental health issues affected her judgment and her ability to put Aaron's needs first. For example, despite mother's lack of housing being a main impediment to her ability to care for Aaron, she left a stable housing situation because she "did not want to live in shared housing with strangers." Mother also refused to tell the Department—or Aaron or her family—where or with whom she was staying.

Maternal aunt told the social worker mother "was paranoid stating that people were stealing her identity and looking for her." Mother also told the social worker about identity theft issues she had experienced due to her older child's father having taken financial aid owed to her. She said that she sometimes thought people were laughing at her. Mother—who had not attended the detention hearing—also insisted Aaron had not been detained from her. Again, she refused to visit Aaron because a

monitor would be present.  Mother stated, " 'I do not want visits I want to be all the way with him.  I don't want anyone there and that's what I am saying I want to give that up right now.' "  The court reasonably could find mother's position—her desire to be with her son, but refusal to visit him at all with a monitor—demonstrated irrational behavior that put her wishes above her son's best interests.  Accordingly, viewing the record in the light most favorable to the juvenile court's findings, we conclude the court reasonably could find mother's apparent paranoia was impairing her ability to care for Aaron and thus placed him at a substantial risk of harm.

Moreover, mother did not seem to appreciate the importance of treating her mental health issues for Aaron's sake.  In November 2023, mother told the social worker she had sought mental health services but could not make her appointments due to her homelessness.  In December 2023, mother told the MAT assessor her mental health had deteriorated in 2019 because she was having trouble grieving her father's death.  The MAT report implies mother told the assessor that she was then being seen by a psychiatrist.  But nothing in the record indicates mother was participating in mental health services at that time.  Mother presented no such evidence at the jurisdiction hearing.  In any event, the assessor was concerned mother would stop her mental health services.  In an LMI, the Department also noted its concern that mother had stopped attending therapy and taking her medication despite her mental health diagnoses.  Minor's counsel expressed his

concern about mother's mental health issues at the jurisdiction hearing, as well.

Accordingly, we affirm the court's jurisdictional finding that Aaron is a child described under section 300, subdivision (b), without considering the court's subdivision (a) finding, or its subdivision (b) findings based on father's conduct and parents' domestic violence.

## DISPOSITION

We affirm the court's jurisdiction and disposition orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


HANASONO, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20